IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUDE C, by his mother and next friend, Sonia C; LIAM C, by his mother and next friend, Sonia C,<br><br>*Plaintiffs*,<br><br>v.<br><br>THEODORE DALLAS, the Secretary of the Pennsylvania Department of Human Services,<br><br>*Defendant*. | CIVIL ACTION<br>No. 15-01065 |

**PAPPERT, J.**                                                                                          June 21, 2016

### MEMORANDUM

Plaintiffs Jude C. and Liam C. (collectively "Plaintiffs") are six-year-old twin boys who have been diagnosed with Autism Spectrum Disorder ("ASD"). Through their mother they contend that as Medicaid recipients and citizens of Pennsylvania they are entitled to certain benefits that the Commonwealth's Department of Human Services ("DHS") must provide under its Medical Assistance program. DHS moves to dismiss Plaintiffs' amended complaint arguing, among other things, that Plaintiffs' claims are not ripe for review. The Court agrees and dismisses Plaintiffs' amended complaint for lack of subject matter jurisdiction.

**I.**

Title XIX of the Social Security Act establishes the federal Medicaid program. (Pls.' Am. Compl. ¶ 11, ECF No. 11.) Under Medicaid, the federal government partially funds services that are provided to Medicaid recipients and covered under a state plan. (*Id.* ¶¶ 11–13.) In Pennsylvania, this is referred to as the Medical Assistance ("MA") program. (*Id.*) Medicaid requires states to make available early and periodic screening, diagnostic and treatment

1

("EPSDT") services to Medicaid eligible persons under the age of twenty one.  (*Id.* ¶ 14.) Medicaid defines EPSDT services as screening services, vision services, dental services, hearing services and "[s]uch other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services . . . ."  (*Id.* ¶¶ 15–18 (quoting 42 U.S.C. § 1396d(r)).)

### A.

Children who are eligible for the MA program and have been diagnosed with ASD can receive Applied Behavior Analysis ("ABA") as an EPSDT service.  (*Id.* ¶ 19.)  Pennsylvania law defines ABA services as "the design, implementation and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior or to prevent loss of attained skill or function, including the use of direct observation, measurement and functional analysis of the relations between environment and behavior."  (*Id.* ¶ 20 (quoting 40 Pa. Cons. Stat. § 764h(f)(1).)  For children with ASD, ABA is the "recognized treatment method for producing socially significant improvement in behavior, through enhancing functional communication, social interaction and other life skills, and eliminating or reducing negative or destructive behaviors."  (*Id.* ¶ 22.)  ABA treatment "significantly" reduces, ameliorates, or eliminates the "negative effects of ASD" for "many children."  (*Id.* ¶ 27.)

Plaintiffs allege that Pennsylvania's MA program "does not directly provide the ABA services" they need.  (*Id.* ¶ 28.)  Pennsylvania instead offers Behavioral Health Rehabilitation Services ("BHRS").  (*Id.* ¶ 29.)  BHRS includes Behavior Specialist Consultant-Autism Spectrum Disorder ("BSC-ASD") services and Therapeutic Staff Support ("TSS") services.  (*Id.* ¶ 34.)  Pursuant to BHRS, behavior specialist consultants assess a child's needs and, based on

those needs, design and direct the implementation of a behavior modification plan. (*Id.*) Therapeutic staff support workers implement the treatment plan. (*Id.*) Plaintiffs contend that BHRS is "not the same as ABA" and does "not treat the development or neurological needs of children with ASD in the same way." (*Id.* ¶ 30.) They note that Pennsylvania has "many ASD service providers who routinely provide ABA services . . . which do not meet Defendant's requirements to be enrolled as BHRS providers in its MA program." (*Id.* ¶ 31.) This, according to Plaintiffs, causes an "absurd and illegal result." (*Id.* ¶ 32.)

### B.

Plaintiffs were diagnosed with ASD when they were two-and-a-half-years old. (*Id.* ¶¶ 49, 73.) Both boys are enrolled in Pennsylvania's MA program. (*Id.* ¶¶ 8–9.) Their developmental pediatrician and neuropsychologist recommended they receive "at least" twenty hours per week of ABA therapy. (*Id.* ¶¶ 51, 75.) In early 2013 Plaintiffs began receiving eight hours of ABA therapy a week through the "Delaware County Early Intervention" program. (*Id.* ¶¶ 52, 76.) Their parents also paid for an additional two hours per week of ABA therapy, for a total of ten hours per week. (*Id.* ¶¶ 54, 78.) Sometime later in 2013, the boys' parents called Keystone First, their MA provider, to find "in-network providers for ABA in an attempt to follow the treatment recommendations by [their] doctors." (*Id.* ¶¶ 57, 81.) Keystone First told the family that there were "no in-network ABA providers" and instructed them to "call Magellan, the [BHRS] administrator for [their] county." (*Id.*)

Magellan informed the family that it did not have any ABA providers, but that the boys "could receive 'ABA-like' services after undergoing an extended assessment with either of two providers, Elwyn or CGRC." (*Id.* ¶¶ 58, 82, 99.) Elwyn and CGRC informed the family that they do not provide ABA, but that the boys could receive "a few hours of BSC time" and

3

possibly an additional two to six hours of "TSS time to work on reducing problematic behaviors." (*Id.* ¶¶ 59, 83.) Plaintiffs did not take any additional steps to secure ABA services at that time. Upon turning three years old, the boys aged out of Delaware County's Early Intervention program and stopped receiving its ABA services. (*Id.* ¶¶ 61, 85.)

On March 3, 2015, two years after the family initially contacted Magellan, they filed this complaint against DHS alleging violations of Title XIX of the Social Security Act, the Pennsylvania Autism Insurance Act (occasionally referred to as "Act 62") and their right to due process under the Fourteenth Amendment. (*See* generally Pls.' Compl., ECF No.1.) Two months after filing the lawsuit, they contacted Chester County Intermediate Unit ("CCIU"), a provider in Magellan's network, inquiring about ABA services for the boys. (Pls.' Am. Compl. ¶¶ 99–100.) On June 11, 2015 a CCIU representative evaluated the boys to determine what services would meet their needs. (*Id.* ¶ 101.) CCIU also met with the boys' parents that day and again on June 30 to discuss their desire for ABA services. (*Id.* ¶¶ 102–04.) After the second meeting, CCIU "put in a request for Magellan to provide Behavioral and Rehabilitative Services to the boys. (*Id.* ¶ 105.) In a July 6, 2015 letter from CCIU to Magellan, CCIU approved the requested services. (*Id.* ¶ 106.) Plaintiffs, however, argue that the services that CCIU is authorized to provide the boys are neither like the ABA services they received from the Early Intervention program nor what they requested. (*Id.* ¶¶ 108–10.)

Plaintiffs amended their complaint on August 28, 2015. They seek declaratory and injunctive relief and an order requiring DHS to "pay for or furnish Plaintiffs' ABA services through the MA program going forward" and also compelling DHS to "promulgate and effectuate policies that protect the constitutional rights of children with ASD, that qualify for Defendant's MA program, to receive ABA services." (*Id.* at 29–30.) Plaintiffs also seek

damages for their "prior costs of paying for their own ABA [s]ervices" and an award of $272,550 for "prior ABA costs that Defendant avoided by not providing prescribed ABA services for the past two years." (*Id.*)

DHS filed a motion to dismiss the amended complaint, arguing that: (1) the claims are not ripe for review; (2) Plaintiffs lack standing; (3) Plaintiffs have failed to a state a claim under the Due Process Clause; and (4) Plaintiffs' state law claim and their claims for monetary relief are barred by the Eleventh Amendment. (Def.'s Mot. to Dismiss at 4, ECF No. 13.) Plaintiffs responded two weeks later and DHS replied a day after. (ECF Nos. 14–15.) The Court heard argument on DHS's motion on May 24, 2016. (ECF No. 19.) The Court concludes that Plaintiffs' claims are not ripe for review and accordingly dismisses the amended complaint for lack of subject matter jurisdiction. DHS's motion to dismiss is denied as moot.

## II.

Ripeness challenges are analyzed under Federal Rule of Civil Procedure 12(b)(1). *See TruePosition, Inc. v. LM Ericsson Telephone Co.*, 899 F. Supp. 2d 356, 358 n.5 (E.D. Pa. 2012). If a plaintiff's claims are not ripe for review, they must be dismissed for lack of subject matter jurisdiction. *Id.*; *see also Munoz v. City of Phila.*, No. 05-cv-5318, 2006 WL 328346, at *1 (E.D. Pa. Feb. 10, 2006) (citing *Armstrong World Indus., Inc. by Wolfson v. Adams*, 961 F.2d 405, 410 n.10 (3d Cir. 1992)). In moving for dismissal under Rule 12(b)(1), a party may present a facial or factual attack on jurisdiction. *See Save Ardmore Coalition v. Lower Merion Twp.*, 419 F. Supp. 2d 663, 666 (E.D. Pa. 2005).

A facial attack asserts that the complaint on its face fails to allege sufficient grounds to establish subject matter jurisdiction. *See Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). In a facial attack, the court must consider the allegations of the

complaint as true and draw all reasonable inferences in favor of the nonmoving party. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). In a factual attack, the defendant challenges the court's jurisdiction based on evidence outside the pleadings and the court may review and rely upon any evidence in assessing jurisdiction. *See id.*; *see also Tanzymore v. Bethlehem Steel Corp.*, 457 F.2d 1320, 1323 (3d Cir. 1972). The plaintiff, as the party asserting jurisdiction, bears the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–09 (3d Cir. 1991). Here, DHS makes a facial attack on jurisdiction. (Def.'s Mot. to Dismiss at 7.)

### III.

Ripeness is a justiciability doctrine that seeks to "'determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Peachlum v. City of York, Pa.*, 333 F.3d 429, 433 (3d Cir. 2003)). In a case about the actions of an agency such as DHS here, the purpose of the ripeness doctrine is to prevent courts "from entangling themselves in abstract disagreements over administrative policies" and to protect the agency from "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *overruled on other grounds by California v. Sanders*, 430 U.S. 99, 105 (1977). To determine ripeness in such cases, courts examine: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."[1] *Abbott Labs.*, 387 U.S. at 149; *see also Nextel Commc'ns of Mid-Atl. v. City of Margate*, 305 F.3d 188, 193 (3d Cir. 2002).

---

[1] As the Third Circuit Court of Appeals observed in *Kushi v. Romberger*, 543 F. App'x 197, 200 n.3 (3d Cir. 2013), courts apply a "more relaxed" ripeness standard when an agency action results in the coercion of a party to comply

To determine whether an issue is fit for judicial review, courts consider "'factors such as whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position, for example, when the challenged prescription is discretionary so that it is unclear if, when or how the agency will employ it.'" *Nextel*, 305 F.3d at 193 (quoting *Felmeister v. Office of Attorney Ethics, a Div. of the N.J. Admin. Office of the Courts*, 856 F.2d 529, 535–36 (3d Cir. 1988)).

Plaintiffs' amended complaint is not fit for judicial review because DHS has not made a final determination with respect to their request for ABA services. *See CEC Energy Co. v. Pub. Ser. Comm'n of V.I.*, 891 F.2d 1107, 1110 (3d Cir. 1989) (holding that the "finality" of an agency action depends in part on "whether the decision represents the agency's definitive position on the question"). Plaintiffs filed suit in federal court rather than pursue DHS's statutorily defined complaint process to its conclusion. Specifically, under Medicaid each "MCO [Managed Care Organization] and PIHP [Prepaid Inpatient Health Plan] must have a system in place for enrollees that includes a grievance process, an appeal process, and access to the State's fair hearing system." 42 C.F.R. § 438.402(a). Pennsylvania's system is codified at 40 Pa. Cons. Stat. Section 991.2141 under Article XXI entitled "Quality Health Care Accountability and Protection." The Commonwealth requires managed care plans or organizations to "establish and maintain an internal complaint process with two levels of review by which an enrollee shall be able to file a complaint regarding a participating health care provider or the coverage, operations

---

with a statute or regulation. A more "lenient standard" is used because "the potential agency decision may force the party to comply with a particular statute or regulation or face a penalty." *Id.*; *see also Peachlum v. City of York, Pa.*, 333 F.3d 429, 435–36 (3d Cir. 1990). Here, Plaintiffs have initiated an administrative process with DHS, asking it to take certain action. DHS has not reached a final decision, but whatever it decides, it will not coerce Plaintiffs to take an action to avoid a penalty. Thus, the ripeness analysis in this case is stricter and focuses on "whether the courts should intervene as a prudential matter in a dispute that is in the process of being pursued administratively." *Peachlum*, 333 F.3d at 436.

or management policies of the managed care plan." 40 Pa. Cons. Stat. § 991.2141(a). The first review includes: (1) a review by an initial review committee consisting of one or more employees of the managed care plan; (2) the allowance of a written or oral complaint; (3) the allowance of written data or other information; (4) a review or investigation of the complaint which shall be completed within thirty days of receipt of the complaint; and (5) a written notification to the enrollee regarding the decision of the initial review committee within five business days of the decision. 40 Pa. Cons. Stat. § 911.2141(b)(1)–(5). The initial review committee's decision specifically includes "the basis for the decision and the procedure to file a request for a second level review of the decision of the initial review committee." 40 Pa. Cons. Stat. § 911.2141(b)(5).

The second review includes: (1) a review of the decision of the initial review committee by a second level review committee consisting of three or more individuals who did not participate in the initial review;[2] (2) a written notification to the enrollee of the right to appear before the second level review committee; (3) a requirement that the second level review be completed within forty-five days of receipt of a request for such review; and (4) a written notification to the enrollee regarding the decision of the second level review committee within five business days of the decision. 40 Pa. Cons. Stat. § 911.2141(c)(1)–(4). The second level review committee's decision "shall include the basis for the decision and the procedure for appealing the decision to the department [DHS] or the Insurance Department." 40 Pa. Cons. Stat. § 911.2141(c)(4).

Allowing DHS to reach a final decision via Section 991.2141's complaint process will enable it to both rule on Plaintiffs' request and provide reasons for its decision. *See Nextel*, 305

---

[2] Additionally, at least one-third of the second level review committee must not be individuals employed by the managed care plan. 40 Pa. Cons. Stat. § 911.2141(c)(1).

F.3d at 193–94.  Even if Magellan's initial review committee denies Plaintiffs' request, Plaintiffs may avail themselves of a second level review and then, if necessary, DHS's administrative appeal process.  During any one of the three appeal stages, Plaintiffs' problems may be remedied, obviating the need for judicial review.  *See Univ. of Med. and Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003) (noting that "'[j]udicial intervention into the agency process denies the agency an opportunity to correct its own mistakes,'" assuming any mistakes were made) (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980)).  Given these various issues and potential outcomes, "further administrative action is needed to clarify . . . [DHS's] position," which will facilitate judicial review.  *Nextel*, 305 F.3d at 193 (citation and internal quotation marks omitted).

      Taking all allegations in Plaintiffs' amended complaint as true, the Court lacks enough information to evaluate the merits of their claims.  *See Nextel*, 305 F.3d at 193.  The Court understands Plaintiffs' position, but that is only half of the story.  DHS has not made clear its "definitive position" on the issue and the Court therefore lacks an administrative record to review because Plaintiffs did not go through the administrative appeal process.  *See CEC Energy*, 891 F.2d at 1110.  Until Plaintiffs have availed themselves of the appeal process and DHS has made a final determination and explained what services it does or does not provide, their claims are not ripe for review.

      For a party's "'hardship to be sufficient to overcome prudential interests in deferral, that hardship must be both immediate and significant.'"  *Nextel*, 305 F.3d at 194 (quoting *Felmeister*, 856 F.2d at 537).  Additionally, in all but the most complex and burdensome cases where the administrative process itself is at issue, administrative expenses do not constitute a hardship to support ripeness.  *See NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 345–46

(3d Cir. 2001).  Here, Plaintiffs are not challenging the legality of the administrative process but rather contend that the process is too burdensome.  (Oral Arg. 46:19–47:4, ECF No. 19.)  The burdens imposed by the administrative process however are "part of the social burden of living under government."  *Corrigan*, 347 F.3d at 70 (quoting *Standard Oil Co. of Cal.*, 449 U.S. at 244).  Plaintiffs' alleged hardship derives from their decision to not pursue *any* administrative process—a process which is not only statutorily defined but also mandates decisions from the first and second review committees in a matter of months.  40 Pa. Cons. Stat. § 911.2141(b)–(c).  Instead of pursuing that process, Plaintiffs waited two years between their initial contact with Magellan and the filing of this lawsuit, and then contacted Magellan months later.  (Pls.' Am. Compl. ¶¶ 99–100.)  Any potential hardship that Plaintiffs may endure from that choice is insufficient to overcome the need for administrative finality which produces an administrative record for the Court to review and an opportunity for DHS to resolve the matter.  *See Corrigan*, 347 F.3d at 69; *Nextel*, 305 F.3d at 193; *CEC Energy*, 891 F.2d at 1110.

      An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.